UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

IN RE THE APPLICATION OF

KENNETH POLSON,

    Petitioner,

and

MEGAN POLSON,

    Respondent.

Case No. 08-cv-564-JPG

**MEMORANDUM AND ORDER**

**I.    Introduction**

This case is before the Court on Kenneth Polson's ("Ken") Petition for Return of Child (Doc. 1). He brings this action under The Convention on the Civil Aspects of International Abduction, done at the Hague on October 25, 1980 ("Convention"), T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.* Ken asks the Court to return his son, Robert Andrew Polson ("Bobby"), to Australia so custody matters can be determined in an Australian Court. His wife Megan Polson ("Megan") has responded to the petition (Doc. 39). The Court held a hearing on September 5, 2008, at which Ken and Megan testified. For the following reasons, the Court will grant Ken's petition.

**II.    Factual Background**

Both parties agree to some background facts. Megan and Ken met in Houston, Texas, in 2000. Megan is a United States citizen; Ken is a British citizen. They began living together in Houston in 2001 and, after Ken received a promotion requiring a move to Australia, moved to Perth, Australia, together in May 2003. They were married in Australia on December 8, 2003, and Bobby

1

was born on December 22, 2003. Ken, Megan and Bobby lived together as a family in Australia and obtained permanent residency status there in July 2007.

In November 2007, Megan and Bobby traveled to the United States, where they remain today. The parties disagree about the circumstances of the November 2007 trip to the United States and its implication for child custody matters.

A. Ken's Testimony

Ken testified that in September 2007 the family had spent two enjoyable weeks on vacation in the United States so he was not surprised when Megan announced she wanted to return to the United States with Bobby for another visit in November 2007. She told Ken she wanted Bobby to be able to spend time with an aging grandfather in the United States. Ken, who was scheduled to quit his job in Australia at the end of November, had no objection to Megan's taking Bobby to the United States for such a visit. He planned to wind up his job in Australia and meet up with them in the United States in January 2008 to discuss his options for future employment, which included job opportunities in Singapore, Dubai, Spain and other locations around the world. Ken drove Megan and Bobby to the airport and saw them off on their trip.

It did not strike Ken as unusual that Megan had purchased one-way tickets for herself and Bobby; she reported to him that the travel agent had said that was the most economical way for them to travel. It also did not seem unusual to him that Megan purchased a seven-month travel health insurance policy for herself and Bobby; health care costs in the United States can accrue quickly in a crisis, he believed she has purchased travel health insurance policies for other trips and the visit to the United States had no firm end date. Ken was also not alarmed when Megan and Bobby shipped 14 containers of personal possessions to Megan's parents' home in northern Illinois

2

before their trip; Megan did not usually pack lightly, and the family might have been moving to an entirely different location in several months so she may have been packing in anticipation of that move too. Several suitcases worth of Megan's clothing and several boxes of Bobby's toys were left behind in Australia.

Before Megan left for the United States, she had in some ways behaved strangely – for example, directing comments to Bobby that were intended for Ken – and had complained that she disliked the climate in Australia. She had not, however, mentioned she wanted to divorce Ken or that she was unhappy in any serious way with their marriage or with his commitment to his work. She also did not mention wanting to keep Bobby permanently in the United States. To Ken, it fully appeared that Megan and Bobby were heading to the United States for a visit of several months before Ken and Megan would decide their future plans together.

While Megan and Bobby were gone, Ken kept in close contact with them both by telephone and e-mail and continued to provide financial support for them. He missed them greatly and on December 1, 2007, the day after his last day at work, wrote an e-mail saying he missed them, he had located American immigration materials and would even be willing to take a job stocking shelves in the United States in order to be with them.

In the meantime, when the lease for the Polsons' Australia home expired in mid-December 2007, Ken signed a three-month lease on an apartment in Perth, anticipating that he may not need a longer lease if he and Megan decided in January 2008 to relocate outside Australia. He intended that his residence be his family's "home," albeit downsized, while Megan and Bobby were on vacation and until they established a new "home" wherever his employment prospects took them.

Ken's January 2008 trip to join Megan and Bobby on vacation in the United States was

delayed due to a credit card problem. In late January, Megan told Ken she wanted a divorce. Via e-mail, Ken immediately apologized and assured Megan he had changed his priorities. Ken, who was still living in Australia, traveled to the United States in March 2008 for a vacation with Megan and Bobby and to attempt to save the marriage. Around that time, Megan informed Ken she and Bobby would be moving from her relatives' house in northern Illinois to southern Illinois and stopped communicating with him regularly about Bobby's life. Nevertheless, Megan and Ken began discussing plans for Bobby to come to Australia.

In late April 2008, Ken received an e-mail from Megan's attorney confirming that divorce was her plan. He testified that he had no objection to the divorce but wanted Bobby returned to Australia for consideration of custody matters. He and Megan arranged for Bobby to return to Australia for several months in late May after his school year was finished. Ken planned at that time to initiate custody proceedings in Australia without informing Megan in advance. Ken purchased a one-way ticket for Bobby to come to Australia. However, in May 2008 when Ken arrived in the United States to pick Bobby up for the trip, he was served with divorce papers from divorce proceedings Megan had initiated in Ogle County, Illinois, and was only able to see Bobby for two hours. Shortly thereafter, Ken revoked Megan's authorization to use their joint credit cards, returned to Australia and filed the pending petition.

B.  Megan's Testimony

Megan testified that she had been extremely unhappy with her marriage to Ken before her November 2007 departure to the United States and that they had had numerous arguments and discussions about her dissatisfaction. She had told Ken she could not live with him anymore, wanted to move back to the United States with Bobby and wanted a divorce, although she did not

4

ever use the actual word "divorce." At that time, Ken was prepared to move back to the United States with her.

When she left Australia for northern Illinois, she clearly had no intention of returning. She purchased one-way tickets and packed the substantial majority of her and Bobby's personal possessions, leaving only a duffle bag of old clothes and some broken toys. She told Ken to give the things she left behind to the Salvation Army. On her travel documents, she indicated she was making a permanent move to the United States. She purchased health insurance because she expected she and Bobby would stay in the United States indefinitely and that seven months would give them an adequate chance to acquire health insurance on their own in the United States.

When she told Ken in late January 2008 that she wanted a divorce, she attempted amicable negotiations about the dissolution of the marriage and custody arrangements. She and Ken agreed Bobby would spend the summer with Ken in Australia, but when she learned in early May 2008 that Ken had purchased a one-way ticket for Bobby, she refused to let him go with Ken.

She maintained regular contact with Ken about Bobby until he filed the pending petition.

C. Court's Factual Findings

To the extent that the parties disagree about the relevant events, the Court makes the following findings based on the demeanor of the witnesses while testifying as well as the reasonableness of their testimony and the documentary evidence presented at the hearing.

Megan wanted a divorce before November 2007 and had plans to return to the United States with Bobby to get it. She had told Ken she was unhappy with their marriage, but he had either not listened to her or had not taken her complaints seriously. In any case, he certainly failed to appreciate the extent of her dissatisfaction with the marriage.

When Megan and Bobby left Australia in November 2007, Ken naively but honestly believed they were departing for a visit of several months to the United States, although the precise number of months had not yet been determined. While Megan clearly intended to have Bobby reside with her in the United States permanently, Ken did not know Megan was doing anything more than taking an extended vacation. He did not see any of the documents on which Megan indicated her return to the United States was a permanent move. He did not intend or consent to Bobby's living on a regular basis in the United States simply by driving them to the airport and letting them depart from Australia without objection, although he consented to their vacation of several months' duration. As the Court noted at the hearing, Ken was keeping his head in the sand about the state of his marriage, but that fact does not amount to consent to Megan's retaining Bobby in the United States or an intent that Bobby regularly reside in the United States. Essentially, until late January 2008, Ken did not object to Megan and Bobby's travels because he still believed they were temporary and in the nature of a vacation.

Ken had hopes that someday he would be employed outside Australia, possibly even in the United States, but those hopes remained aspirational. His December 2007 three-month flat lease reflected a temporary downsizing in light of his uncertainty about where his family would be in the future as opposed to an intent to move his family from Australia to the United States.

Once Megan explicitly told Ken in late January 2008 that she wanted a divorce, she and Ken discussed custody arrangements for Bobby. Ken's efforts to patch up the marriage in March 2008 and to have Bobby returned to Australia for custody proceedings do not reflect his intent for Bobby to reside regularly with Megan in the United States or his consent to his retention there.

**III. Analysis**

    A. <u>Jurisdiction and Authority</u>

The Court has the power to exercise jurisdiction over this matter pursuant to 42 U.S.C. § 11603(a). Under the ICARA, the Court must decide this case in accordance with the Convention. 42 U.S.C. § 11603(d).

    B. <u>The Convention and the ICARA</u>

Both the United States and Australia are signatories to the Convention, which has as a purpose to implement an effective deterrent to the practice of parental kidnaping. *Feder v. Evans-Feder*, 63 F.3d 217, 221 (3d Cir. 1991); *see, generally, Koch v. Koch*, 450 F.3d 703, 711 (7th Cir. 2006). The Convention's preamble states that the signatories desire "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence[.]"

The Convention's approach to the problem is straightforward, "[i]t is designed to restore the factual status quo that is unilaterally altered when a parent abducts a child and protect the legal custody rights of the non-abducting parent." *Feder*, 63 F.3d at 221. Accordingly, its principle feature is to mandate the return of the child "to his or her circumstances prior to the abduction if one parent's removal of the child . . . violated the custody rights of the other." *Id*. The Convention deprives the abduction itself of any jurisdictional consequences because the signatories agreed to send a child wrongfully removed to the place of removal without making any determinations on the underlying custody of the child. *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001).

The ICARA entitles a person whose child has been wrongfully removed to or retained in the United States to petition in federal court for the return of the child. 42 U.S.C. § 11603(b). An action

under ICARA seeks not a determination of custody rights but instead a determination solely of the proper forum to determine custody rights. Convention art. 19; *Koch*, 450 F.3d at 711.

To succeed on a petition under the Convention, a petitioner must establish by a preponderance of the evidence that the respondent "wrongfully removed or retained" a child within the meaning of the Convention. 42 U.S.C. § 11603(e)(1)(A). The removal or retention of a child is wrongful where: "(a) it is in breach of custody rights attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of the removal or retention those rights were actually exercised . . . or would have been exercised but for the removal or retention." *Hague International Child Abduction Convention; Text and Legal Analysis*, 51 Fed. Reg. 10494, 10505 (1986); *accord* Convention art. 3; *Koch*, 450 F.3d at 712.

Once the petitioner meets his initial burden, the burden shifts to the respondent to show "by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies" or "by a preponderance of the evidence that any other exception set forth in article 12 or 13 of the Convention applies." 42 U.S.C. § 11603(e)(2)(A), (B).[1] In this case, Megan

---

[1] In *Fabri v. Pritikin-Fabri*, 221 F.Supp.2d 859, 863 (N.D. Ill. 2001), the court offered this summary of the affirmative defenses under the Convention:
> Four exceptions to the reach of the Convention are set forth in Articles 12, 13, and 20. The responding parent bears the burden of proving that one of these exceptions applies. For two of the exceptions, the burden is one of "clear and convincing evidence." Specifically, the responding parent may avoid an order returning the child if she can demonstrate by clear and convincing evidence (1) that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," Art. 13(b), or (2) that returning the child would be inconsistent with "fundamental principles . . . relating to the protection of human rights and fundamental freedoms." The other two exceptions are subject to proof by a preponderance of the evidence. These include a showing (3) that judicial proceedings were not commenced within one year of the

relies on the exception in article 13(a): that Ken consented when she removed Bobby from Australia and retained him in the United States.

### C. Application to this Case

#### 1. Habitual Residence

The first step in determining whether Ken's petition should be granted is to determine Bobby's habitual residence when he was allegedly wrongfully removed or retained. This determination is a mixed question of law and fact. *Koch*, 450 F.3d at 710; *Feder*, 63 F.3d at 222 n.9; *Mozes*, 239 F.3d at 1073. Though courts are encouraged to give the two words their ordinary and natural meaning, to achieve consistency and predictability courts focus on an assessment of intent to abandon a prior habitual residence and the shared intent of the parents. *Koch*, 450 F.3d at 712-13; *Mozes*, 239 F.3d at 1075-76. However, the court should also consider whether a child has become "acclimatized to the new environment to such a degree that the child became a habitual resident of the new country despite the parents' shared intentions." *Koch*, 450 F.3d at 714; *Mozes*, 239 F.3d at 1078-79. In such a case, the new environment may be the "habitual residence." *Koch*, 450 F.3d at 714 (citing *Gitter v. Gitter*, 396 F.3d 124, 133 (2d Cir. 2005) (evidence must unequivocally point to acclimatization to new environment)); *Mozes*, 239 F.3d at 1079. Factors important to this consideration include "the conduct and overtly stated intentions and agreements of the parents during the period preceding" the abduction. *Whiting v. Krassner*, 391 F.3d 540, 549 (3d Cir. 2004).

---

        child's abduction, and she is now well-settled in her new home, Art. 12, or (4) that the petitioning parent was not actually exercising custody rights at the time of the child's removal.
(citations omitted).

Ken argues that Australia was Bobby's habitual residence at all relevant times. He bases this contention on the fact that Ken, Megan and Bobby lived there together as a family from 2003 to November 2007 and that Megan took Bobby to the United States and then attempted to retain him there against Ken's wishes. Megan argues that Bobby's habitual residence was the United States because the settled intention of both parents was for Bobby to live with her permanently in the United States after November 2007.

Bobby's habitual residence has as all times been Australia. It is clear that prior to November 2007, Ken and Megan shared a settled intent to reside with Bobby in Australia in a regular family household. Indeed, he was born there and up to that time had lived all his life there except for vacations outside the country. All objective indicia and the parties statements indicate that, prior to November 2007, Ken and Megan shared the intent that they and Bobby habitually reside in Australia.

Nothing that happened after November 2007 indicates Bobby's habitual residence changed. Once a person has a habitual residence, it can be changed by

> forming a settled intention to abandon the one left behind. Otherwise one is not habitually residing; one is away for a temporary absence of long or short duration. Of course, one need not have this settled intention at the moment of departure; it could coalesce during the course of a stay abroad originally intended to be temporary. Nor need the intention be expressly declared, if it is manifest from one's actions; indeed, one's actions may belie any declaration that no abandonment was intended.

*Mozes*, 239 F.3d at 1075 (footnote omitted); *accord Koch*, 450 F.3d at 713. While some cases are clear once all facts are considered, there are gray areas like the case at bar,

> where the petitioning parent earlier consented to let the child stay abroad for some period of ambiguous duration. In these cases, the circumstances surrounding the child's stay may sometimes suggest that, despite the lack of perfect consensus, the parents intended the stay to be indefinite, leading to an abandonment of the prior

10

> habitual residence. In other cases, the circumstances might suggest that there was no settled mutual intent to abandon the prior habitual residence.

*Koch*, 450 F.3d at 713. A change in habitual residence required "an actual change in geography, as well as the passage of an appreciable amount of time." *Koch*, 450 F.3d at 715. The stronger the indicia of intent to change habitual residence, the less time is required to work a change. *See id.*

While it is clear that Megan intended to change Bobby's habitual residence when she took him to the United States in November 2007, at no time did Ken agree to that change. First, Ken's agreement to allow Megan to take four-year-old Bobby on a vacation abroad to relatives' homes for several months is simply not for such an appreciable amount of time that it would indicate Ken's intent to change Bobby's habitual residence. Second, while a parent whose child is removed from him may, at some point, either by his words or conduct, agree to the child's taking up residence at the place to which he was removed, *Koch*, 450 F.3d at 713, that did not happen in this case. Until late January 2008 when Megan announced she wanted a divorce, Ken could not have agreed to any such arrangement because he still believed Megan and Bobby were on a temporary vacation visiting family and would rejoin him before deciding where the family would move next.

One may think that Ken's intent to relocate the entire family out of Australia in early 2008 to accommodate his new employment might indicate an intent to abandon Australia as a habitual residence. The planned relocation, however, was only aspirational and did not come to pass. In fact, the disintegration of the Polsons' marriage called a halt to those plans, and Ken remained in Australia with hopes that at least Bobby would return to him there.

Once Megan announced she wanted a divorce, Ken continued to work toward having Bobby returned to Australia. True, his efforts were sporadic and lacking in complete candor, sometimes directed at reestablishing his family unit and sometimes directed at negotiating arrangements where

11

Megan would allow Bobby to travel back to Australia where he could then pursue custody proceedings there. Nevertheless, at no time did Ken, either by acquiescence or overt agreement, indicate an intent that Bobby regularly reside outside Australia in the United States. His steady intent, once he knew divorce was imminent, was always to have Bobby returned to Australia so Australian courts could determine the appropriate custody arrangement.

In light of lack of other evidence of a shared intent to abandon Australia as Bobby's habitual residence, the Court cannot say that the seven or eight months between his departure from Australia and the filing of the pending petition is such an appreciable amount of time that it indicates abandonment of a habitual residence in the particular circumstances of this case.

In sum, the preponderance of the evidence shows that Ken and Megan had no shared intent to abandon Australia as Bobby's habitual residence and to establish a new habitual residence for him in the United States or anywhere else. Bobby's habitual residence in Australia was not "effectively abandoned and a new residence established by the shared actions and intent of the parents coupled with the passage of time." *Koch*, 450 F.3d at 715.[2]

    2.    <u>Breach of Custody Rights</u>

The Court is entitled to take direct judicial notice of the law of the habitual residence in determining whether the abduction was in breach thereof. Convention art. 14, T.I.A.S. No. 11670; *Mozes*, 239 F.3d at 1084. Under the provisions of the Australian Family Law Act 1975 cited by Megan in her memorandum, each parent is a joint guardian and a joint custodian of their child and has the right to make decisions concerning daily care of the child. Thus, Megan and Ken have the

---

[2]Megan does not argue that Bobby's acclimatization to the United States should negate his habitual residence determined by his parents' shared intent.

12

same rights to make decisions regarding Bobby's day-to-day care. Megan's retaining Bobby in the United States beyond a temporary "vacation" period against Ken's wishes to have him back in Australia for a custody determination by Australian courts breached Ken's parental custody rights over Bobby.

### 3. Exercise of Custody Rights

At all relevant times, Ken exercised or attempted to exercise his custodial rights as to Bobby. As Megan pointed out in her memorandum, whenever a parent keeps or seeks to keep regular contact with his child, the parent is exercising rights to custody, *see Freidrich v. Freidrich*, 78 F.3d 1060, 1065 (6th Cir. 1996), and that is just what Ken did in this case. For the first few months Megan and Bobby were in the United States, Ken kept in regular contact with Megan about the daily activities of Bobby's life and provided the degree of parental guidance expected from a father left at home while the mother and child are on an extended vacation. Ken continued to support Megan and Bobby financially until divorce papers were filed and remained intent on having Bobby returned to Australia so that his custody rights could be determined in that forum.

For the foregoing reasons, the Court finds Ken has met his burden of showing Bobby was wrongfully retained in the United States in breach of Ken's custody rights. The Court must now examine whether Megan can establish a defense to the petition.

### 4. Consent to Removal/Retention

To avoid an order of return once a petitioner has shown wrongful removal or retention, a respondent may show by a preponderance of the evidence that the petitioner "had consented to or subsequently acquiesced in the removal or retention." Convention art. 13(a); *see* 42 U.S.C. § 11603(e)(2)(B). For the same reasons the Court found Ken did not agree to let Bobby habitually

reside in the United States, the Court finds that Ken did not consent to his retention in the United States beyond the period of an extended vacation of several months' duration. Megan has not carried her burden of demonstrating the defense of consent.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Ken's petition for return of Bobby to Australia and **ORDERS** that Bobby be returned to Australia on September 27, 2008, or any earlier date mutually agreeable to the parties. The Court further finds that, due to the disparity in the financial resources between Megan and Ken, an award of expenses under 42 U.S.C. § 11607(b)(3) is clearly inappropriate. This case is closed.

**IT IS SO ORDERED.**
**DATED: September 11, 2008**

                                                  s/ J. Phil Gilbert
                                                  **J. PHIL GILBERT**
                                                  **DISTRICT JUDGE**